IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRY WILLIAMS,** | : | |
| *Plaintiff, pro se* | : | **Civil Action No. 2:18-cv-05418-NIQA** |
| | : | **Lead Case** |
| v. | : | |
| | : | |
| **MELISSA ARNETTE ELLIOTT A/K/A** | : | |
| **MISSY "MISDEMEANOR" ELLIOTT, et al.** | : | |
| *Defendants* | : | |

| | | |
|---|---|---|
| **MELISSA ARNETTE ELLIOTT** | : | |
| *Plaintiff* | : | **Civil Action No. 2:21-cv-02290-NIQA** |
| | : | |
| v. | : | |
| | : | |
| **TERRY WILLIAMS** | : | |
| *Defendant, pro se* | : | |
| | : | |

### MELISSA ARNETTE ELLIOTT'S TRIAL MEMORANDUM

MELISSA ARNETTE ELLIOTT, professionally known as "MISSY ELLIOTT" ("**Elliott**"), by and through undersigned counsel, and pursuant to this Court's Order dated February 7, 2025 [ECF 307], respectfully submits this Trial Memorandum in connection with Civil Action No. 2:18-cv-05418-NIQA (the "**Williams Action**") and Civil Action No. 2:21-cv-02290-NIQA (the "**Elliott Action**") which have been consolidated.

I.   INTRODUCTION

In the Williams Action, Williams claims that four (4) songs from album "*4 All the Sistas Around da World*" by the musical group SISTA entitled "*Sweat You Down,*" "*Secret Admirer,*" "*I Wanna Know,*" and "*I Wanna Be With U*" (collectively, the "**4 SISTA Songs**") are derived from three (3) unpublished recordings Williams claims to have in a collection of 34 unpublished recording featuring the vocal performances of Elliott and the vocal performances of an artist named Nicole Wray, which Williams has entitled "*Word is Bond,*" "*If Your My Man,*" and "*Got me High*". Pursuant to Williams' derivative work claims, Williams seeks an accounting of all profits Elliott has derived from the four (4) SISTA songs. In addition, Williams is seeking a declaration that Williams is a joint

1

author with Elliott of the compositions underlying the 34 unpublished recordings Williams claims to have in his collection.

Elliott denies those claims and asserts that Elliott the entire SISTA album was created and delivered to SISTA's record company before Elliott ever met Williams, including the 4 songs entitled "*Sweat You Down*," "*Secret Admirer*," "*I Wanna Know*," and "*I Wanna Be With U*", for which Elliott independently created the lyrics, melodies, and vocal arrangements.

In the Elliott Action, Elliott seeks a declaration that the 34 unpublished recording Williams claims to maintain in a collection are not joint works under the Copyright Act and that Elliott is the sole author of the lyrics, melodies, and vocal arrangements within the compositions underlying the 34 unpublished recordings.

**II.     FACTUAL BACKGROUND**

1.     In 1992, Elliott, along with three other members of the musical group "*SISTA*", entered into an exclusive recording agreement with a record label owned by Donald Earle DeGrate Jr. p/k/a DeVante ("**DeVante**"), called Swing Mob Swing Mob Productions, Inc. ("**Swing Mob**") (the "**Exclusive Recording Artist Agreement**"). [ECF 325 at ¶4, Ex. A].

2.     In 1993, Elliott and the other members of SISTA signed an inducement letter with Elektra Entertainment, a division of Warner Communications, Inc. ("**Elektra Records**"), granting Elektra Records all the same rights and remedies *SISTA* had granted Swing Mob pursuant to the Exclusive Recording Artist Agreement (the "**1993 Inducement Letter**"). [ECF 325 at ¶7, Ex. C].

3.     This 1993 Inducement Letter was necessary because, after *SISTA* signed the Exclusive Recording Artist Agreement with Swing Mob, Swing Mob entered into a separate agreement with Elektra Records, which caused *SISTA* to be in an exclusive group artist agreement with Elektra Records. [ECF 325 at ¶8].

4.     Within a letter dated September 22, 1995, counsel for SISTA at the time formally notified Swing Mob that, because *SISTA* fulfilled their minimum recording commitment under the Exclusive Recording Artist Agreement, and Swing Mob elected to not exercise its option for further period masters, *SISTA's* exclusive obligations to Swing Mob under the Exclusive Recording Artist Agreement were terminated (the "**1995 Termination Letter**"). [ECF 325 at ¶9].

5. Taken together, these contemporaneous documents confirm that the *SISTA* album entitled *4 All the Sistas Around da World*, which was set to be publicly released by the group *SISTA* in 1994, was created well before Williams ever recorded any of Elliott's lyrics, melodies, or vocal arrangements, and more than 2 years before Williams claims in his Fourth Amended Complaint to have "parted ways" with Elliott. [ECF 325 at ¶10; ECF 91 at 1 and ¶¶12, 31].

6. More specifically, throughout the time period of 1993 to 1995, Elliott worked extensively as a songwriter for "*SISTA*". The "*SISTA*" album, entitled *4 All the Sistas Around Da World*, included the promotional single entitled "*Brand New*", which promotional single was publicly released by Elektra Records on October 17, 1994. Elliott is credited on the album *4 All the Sistas Around Da World*, and the credited producers on the album include DeVante and Timothy Zachary Mosley p/k/a Timbaland. [ECF 325 at ¶11].

7. The "*SISTA*" album entitled *4 All the Sistas Around Da World*, also included the songs "*Sweat You Down*", "*Secret Admirer*", "*I Wanna Know*", and "*I Wanna Be With U*". [ECF 325 at ¶12].

8. Williams did not write a single lyric or in any manner contribute to any of the songs featured on the studio album *4 All the Sistas Around da World* by *SISTA* and, in fact, as these documents confirm, Elliott did not even know of or meet Williams until after *SISTA's* Exclusive Recording Artist Agreement with Swing Mob was terminated in 1995. [ECF 325 at ¶13].

9. Specifically, as the Exclusive Recording Artist Agreement and related documents demonstrate, as of 1992, Elliott and the other members of *SISTA* were signed to an Exclusive Recording Artist Agreement with Swing Mob and, as of 1993, Elliott and SISTA were in an exclusive group artist agreement with Elektra Records, pursuant to which they were bound to exclusively render their performances for Elektra Records and Swing Mob in connection with the production of records. It was pursuant to these agreements that SISTA created the "*SISTA*" album that was set to be released in 1994. [ECF 325 at ¶14].

10. In addition, as set forth in Paragraph 4 of the Exclusive Recording Agreement, based upon Swing Mob being the exclusive owner of the master sound recordings embodied in the SISTA album, Swing Mob maintained full control over (i) the selection of any producers of the SISTA album

songs; (ii) the selection of any material to be recorded on the SISTA album; *and* (iii) the selection of dates of rehearsal/recording and the studio where recording was to take place, including the cost of recording, with Swing Mob fully responsible for the scheduling and booking of all studio time. [ECF 325 at ¶15].

11. Accordingly, not only had Elliott not yet referenced and sang any of her lyrics at Williams' home studio at the time the *SISTA* album was created, Elliott and the other members of *SISTA* were bound to an Exclusive Recording Agreement whereby Swing Mob maintained full control over the producers of the *SISTA* album and full responsibility for scheduling, booking, and paying for all studio time rehearsing and recording the *SISTA* album songs. As such, while operating under this Exclusive Recording Agreement, pursuant to which Swing Mob fully controlled and was solely responsible for the selection of any producers and for scheduling, booking, and paying for rehearsal/recording at any studios, it is entirely implausible that Elliott would be rehearsing or recording any songs at Williams' home studio. [ECF 325 at ¶16].

12. However, after production of the *SISTA* album *4 All the Sistas Around da World* was completed, including the songs "*Sweat You Down*", "*Secret Admirer*", "*I Wanna Know*", and "*I Wanna Be With U*", for which Elliott independently created the lyrics, melodies, and vocal arrangements, Elektra Records decided to shelve the album. [ECF 325 at ¶17].

13. Subsequently, with Devante unable to reach another deal with a major record label on behalf of *SISTA*, the rights in various preexisting unreleased songs Elliott had written remained with Elliott, which is further reflected within the 1995 Termination Letter. [ECF 325 at ¶18].

14. With the rights to certain unreleased "*SISTA*" songs Elliott had previously written having remained with Elliott following the 1995 Termination Letter, Elliott would ***thereafter***, in or around 1995 and 1996, test out some of Elliott's song lyrics, vocal arrangements, and melodies that would have belonged to Elektra Records had Elektra Records and Swing Mob exercised their option for further period *SISTA* masters. Specifically, in or around 1995 and 1996, following the 1995 Termination Letter, Elliott would on occasion reference and sing some of those preexisting song lyrics, vocal arrangements, and melodies alongside different preexisting musical beats to experiment

4

with new sound combinations for those songs, including preexisting beats within Williams' database. [ECF 325 at ¶19].

15. However, Elliott had already written the lyrics, vocal arrangements, and melodies for the 4 *SISTA* Songs "*Sweat You Down*", "*Secret Admirer*", "*I Wanna Know*", and "*I Wanna Be With U*" well before Williams ever recorded any of Elliott's lyrics, melodies, or vocal arrangements. In addition, the *SISTA* album single, *Brand New*, was already publicly released as of October 17, 1994, well before Williams ever recorded any of Elliott's lyrics, melodies, or vocal arrangements. [ECF 325 at ¶20].

16. Williams' sworn deposition testimony in this case also confirms this. Specifically, during his 2021 deposition, Williams testified as follows:

> **Q.** Is it possible that you may have worked with Missy Elliott a little longer into 1996, but you didn't even start working with her until 1995?
>
> **A.** I don't think so.
>
> **Q.** Why not?
>
> **A.** Because she was trying to get her group Sista to get a record deal supposedly in '94, '95, around there. So, we worked together to try to get them some songs.

[ECF 325 at ¶21, Ex. "E"].

17. Per Williams' deposition testimony, at the time Williams claims Elliott was recording in his home studio, Elliott was allegedly "trying to get her group Sista to get a record deal," which Williams estimates to have been in around 1994 or 1995. However, as the Exclusive Recording Artist Agreement and related documents reflect, Elliott and the other members of *SISTA* were already signed to the Exclusive Recording Artist Agreement as of 1992, 1993, and 1994, and remained signed to that Exclusive Recording Artist Agreement until the 1995 Termination Letter. Accordingly, consistent with Williams' own testimony, the actual year Elliott was at Williams' home studio was, at the earliest, 1995, as prior to that, Elliott and the other members of SISTA already had and were operating under an exclusive "record deal." [ECF 325 at ¶22].

18. This necessarily means that Williams unequivocally did not and could not have contributed anything whatsoever to these 4 *SISTA* Songs, as Elliott and the other members of *SISTA* had long ago already created and delivered the full *SISTA* album to Swing Mob and Elektra in 1994, including all tracks that are referenced by Williams in this Action, well before Williams ever recorded any of Elliott's lyrics, melodies, or vocal arrangements. [ECF 325 at ¶23].

19. Williams' deposition testimony further confirms that Williams did not meet Elliott until **after** the *SISTA* single "*Brand New*" was publicly released, which was on October 17, 1994, well after Elliott and the other members of *SISTA* had already created and delivered the full *SISTA* album to Swing Mob and Elektra pursuant to the Exclusive Recording Artist Agreement. Specifically, Williams testified as follows during his deposition:

> **Q.** But you mention in your pleading in Pennsylvania that there was an album that was either released or you say it might have been shelved.
>
> **A.** I believe that was for a single. I never saw an album. I saw a single. In 2017 or '18, I realized that that album was shelved at that time. So, I heard nothing between that time.
>
> **Q.** But you saw a single in 1994, right?
>
> **A.** I saw a who? I am sorry.
>
> **Q.** **You are aware that Sista released a single in 1994, is that what you are saying**?
>
> **A.** That is the only thing I ever heard of. But after that, I didn't know who she was or where she came from or anything.
>
> **Q.** Who is she?
>
> **A.** Missy. I thought that song came out before that.
>
> **Q.** What song?
>
> **A.** The one you are referring to.
>
> **Q.** I am not referencing anything.
>
> **A.** Okay.
>
> **Q.** What is the name of the single that you are recalling?

|   |   |   |
|---|---|---|
|   | A. | **Brand New.** |
|   | Q. | Okay. |
|   | A. | **That is the first time I saw Missy.** That was it. I didn't even know that was Missy. I just knew that song when I heard it on the video, and I never heard it again. |
|   | Q. | **And you didn't have anything to do with that song; is that right?** |
|   | A. | **No, sir.** |
| . . . | Q. | I mean, who released the single? |
|   | A. | I don't know. |
|   | Q. | Have you ever looked into it? |
|   | A. | Nope. |
|   | Q. | You are not – |
|   | A. | <u>I remember that song and then I was hooked up with Missy, and we started going from there. That was it.</u> |
| . . . | Q. | **I am just trying to understand your thought process as to why you believe the group Sista released music that could possibly have anything to do with you?** |
|   | A. | **I can't answer that, sir. I am sorry.** |

[ECF 325 at ¶24, Ex. "E" at 299:24-303:18. (Emphasis supplied).

    20.    According to Williams' own testimony, Williams heard the *SISTA* song "*Brand New*" and then met Elliott thereafter. Although "*Brand New*" was the first single on the *SISTA* album, Elliott and the other members of *SISTA* had already previously created and delivered the entire *SISTA* album to Swing Mob and Elektra Records, including the 4 SISTA Songs "*Sweat You Down*", "*Secret Admirer*", "*I Wanna Know*", and "*I Wanna Be With U*" (SISTA fulfilled their "Minimum Recording Commitment" in December 1993, which was defined as "One (1) Album"). As Williams himself alleges, however, that entire "album" was subsequently "shelved." [ECF 325 at ¶25; ECF 91 at ¶33].

21. Williams' 2017 copyright registrations (e.g., SRu001299591, PAu003884203, PAu003894328) unilaterally listing Elliott as a joint author are unverified and are devoid of any semblance of evidentiary weight, [ECF 72, p. 18; 311, p. 6]. Williams first claimed joint authorship in 2017, via Constance Gary, over 20 years after the unpublished recordings were made. [ECF 311-2 at 8].

22. Williams' objections to the authenticity of the documents Elliott's former attorney from the early-mid 1990s located several months ago are palpably improper and without merit. It was Williams who decided to file a legal action related to unpublished recordings of which he claims to have been in possession for more than 30 years. Moreover, the Exclusive Recording Artist Agreement and related documents align with Elliott's prior disclosures and cause no prejudice to Williams.

23. Although Williams advances the blanket contention that the 4 SISTA Songs somehow derive from 3 of the unpublished recordings [ECF 91, ¶ 18], Williams has never provided any evidence showing how these 4 SISTA Songs are allegedly derivative and has further altogether failed to provide any evidence that Williams himself actually made any contributions to the 4 SISTA Songs. Williams' deposition testimony further acknowledges that Williams has no knowledge of how the 4 SISTA Songs allegedly derive from 3 of the unpublished recordings he claims to possess. [ECF 269-3 at 13–21]. Williams failed to designate an expert to analyze derivation [ECF 287], and his deeply speculative damages estimate of $18,937 [ECF 295, ¶ 11] vastly exceeds the documented $27.16 in "profits" to which Williams would be entitled in the event his claims had any merit (which they do unequivocally do not) [ECF 269].

### III. RELEVANT PROCEDURAL HISTORY

Williams filed the Williams Action in December 2018, seeking profits derived from the exploitation of the 4 SISTA Songs and Aaliyah's song "Heartbroken" [ECF 91].

On August 26, 2024, the Court granted Elliott's motion for summary judgment as to "Hearbroken," dismissing all claims related to "Heartbroken" in their entirety. [ECF 285, 289].

Williams' remaining claims allege that the 4 SISTA Songs from the SISTA album "*4 All the Sistas Around da World*" are somehow derivative of 3 of the unpublished recordings Williams claims to have in his collection. [ECF 91, ¶¶ 18, 31–33].

Elliott filed the Elliott Action in 2021, whereby Elliott is seeking a declaration of sole authorship and ownership in musical compositions consisting of lyrics, vocal arrangements, and corresponding melodies Elliott solely created and authored. By virtue of Elliott referencing and singing her preexisting lyrics, vocal arrangements, and corresponding melodies at Williams' former home studio approximately 30 years ago alongside certain preexisting musical beats or backing tracks in Williams' database, these musical compositions underpin thirty-four (34) unpublished and unfinished recordings Williams now purports to maintain in a "collection" of recordings featuring Elliott's vocal performances and the vocal performances of an artist named Nicole Wray (the "**Unpublished Recordings**"). In addition, within the Elliott Action, Elliott is seeking a declaration that Elliott is the sole and exclusive author and owner of certain notepads, including handwritten notes, lyrics and/or signatures of Elliott that are currently in Williams' possession (collectively, the "**Handwritten Materials**"). [ECF 68].

## IV. LEGAL ISSUES PERTINENT TO WILLIAMS' CLAIMS

### A. Williams' State Law Claims are Preempted

Williams' state law causes of action (including for breach of fiduciary duty, unjust enrichment, accounting, quantum meruit, and constructive trust) are entirely preempted by the Copyright Act, 17 U.S.C. § 301. These claims are not qualitatively different from his core allegation that he is a co-owner of copyrighted works and has been excluded from the exploitation of those works. Because each of the state law claims merely seeks to vindicate rights that are "equivalent to" those protected under federal copyright law, preemption is proper and dispositive.

Section 301(a) of the Copyright Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title." 17 U.S.C. § 301(a). Courts routinely dismiss state law claims that merely repackage a purported copyright ownership dispute in state law garb. See *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004); *Ritchie v. Williams*, No. 19-cv-09140, 2021 WL 3493716, at *5 (S.D.N.Y. Aug. 9, 2021) ("claims for unjust enrichment and constructive trust that arise from ownership or use of a copyrighted work are preempted").

Here, all Williams' state law claims derive from his alleged—but legally and factually baseless—assertion that he is a joint author or co-owner of the Unpublished Recordings and, in turn, that the 4 SISTA Songs are allegedly derivative of 3 of the 34 Unpublished Recordings. However, it is well settled that "[t]he duty to account for profits presupposes a relationship as co-owners of the copyright," not merely collaborators. *Weber v. Geffen Records, Inc.*, 63 F. Supp. 2d 458, 464 (S.D.N.Y. 1999); see also *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984) ("[t]he duty to account . . . comes from equitable doctrines relating to unjust enrichment and general principles of law governing the rights of co-owners"). Because any such claims necessarily arise under copyright law — these state law causes of action are preempted.

Moreover, Williams' fiduciary duty claim fails not only on the merits but also as a matter of law. Courts have consistently held that "there are traditionally no fiduciary duties owed between joint authors or copyright holders." *Mills v. Cottrell*, No. 04 Civ. 5562, 2006 WL 3635325, at *5 (S.D.N.Y. Dec. 8, 2006); *Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp. 3d 807, 819 (S.D.N.Y. 2019) ("[c]o-owners of a copyright do not have a fiduciary duty to each other based on that co-ownership itself"). Williams alleges no facts establishing the type of confidential, trust-based relationship necessary to create fiduciary duties under Pennsylvania law. His claim fails as a matter of both federal preemption and state substantive law.

Finally, Williams' request for constructive trust is also fatally flawed. A constructive trust is a remedy, not a standalone cause of action, and under Pennsylvania law, such a remedy arises only where there is evidence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship. *Yohe v. Yohe*, 466 Pa. 405, 411, 353 A.2d 417, 420 (1976). None of those elements are present here. In fact, the absence of any fiduciary duty or special relationship between the parties independently precludes the imposition of a constructive trust. See *Buchanan v. Brentwood Sav. & Loan Ass'n*, 457 Pa. 135, 150, 320 A.2d 117, 126 (1974).

In short, Williams' state law claims are textbook examples of copyright preemption. Williams seeks to recover for the alleged exploitation of musical works he contends, without evidentiary support, derive from unpublished recordings he claims to have co-authored with Elliott. Those allegations are governed exclusively by federal law. Because he cannot point to any rights or duties

distinct from those arising under federal copyright law, all of his state law claims are preempted and fail as a matter of law.

### B. Williams' Count V for Declaratory Judgment Fails

Williams' claims for a declaratory judgment of co-ownership in the Unpublished Recordings, and from that, an alleged entitlement to profits from the derivative exploitation of the 4 SISTA Songs (Count V) is devoid of evidentiary support. The evidence demonstrates that the SISTA Songs were created and recorded well prior to Elliott ever meeting Williams, and that there was never any mutual intent to create joint works with Williams in connection with the Unpublished Recordings. [ECF 91, ¶¶ 61–70; ECF 269 at 30–38.]

To prove his claims of co-authorship of the 34 Unpublished Recordings, Williams must show by a preponderance of the evidence that (1) Williams contributed some non-trivial amount of creative, original, or intellectual expression to each of the compositions underpinning the 34 unpublished recordings; *and* (2) both Williams and Elliott intended that their contributions to the compositions underpinning the 34 unpublished recordings be merged into inseparable or interdependent parts of a unitary whole, meaning, they intended their contributions to be merged into single works and that each would share authorship rights in their respective contributions. *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014).

Here, there is no evidence of mutual intent. As repeatedly set forth in Elliott's sworn declarations, Elliott never, at any time, shared, or intended to share, any rights of authorship with Williams in the lyrics, vocal arrangements, and corresponding melodies embodied in any of the Unpublished Recordings, **all of which Elliott independently wrote and authored**. [ECF 269-1 at ¶¶25, 26, and 44]. Because Elliott never, at an time, shared, or intended to share, any rights of authorship with Williams in the lyrics, vocal arrangements, and melodies embodied in any of the Unpublished Recordings, all of which Elliott independently wrote and authored, Elliott is entitled to a Declaratory Judgment as a matter of law that Elliott is the sole author and owner of her own lyrics, vocal arrangements, and melodies underlying the Unpublished Recordings.

In addition, although joint authors acquire an undivided ownership interest in the entire work, including all the contributions contained therein, this is separate and distinct from the joint authors'

11

ownership rights in independent, preceding, underlying works. Merely using a previously created independent work in a subsequent joint and derivative work does not give the joint author any interest in the original, independent work. *Brownstein v. Lindsay*, 812 Fed.Appx. 75, 78 (3d. Cir. 2020) ("the EDS was an 'independent work,' of which Lindsay was the 'sole author. And merely using the EDS in the LCID did not affect Lindsay's ownership of her rules, nor give Brownstein any rights in them"); *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990) ("[j]oint authorship in a prior work is insufficient to make one a joint author of a derivative work").

Elliott contends that, prior to Williams recording the 34 unpublished recordings featuring the vocal performance of Elliott at his home studio, Elliott maintained independent, preceding, underlying works consisting of Elliott's independently created lyrics, melodies, and vocal arrangements, and that it was these preexisting lyrics, melodies, and vocal arrangements that Williams recorded Elliott referencing and singing at Williams' home studio. In turn, it is undisputed that the 34 Unpublished Recordings consist of preexisting musical instrumental or "beats" that Williams already maintained in his database of instrumentals or "beats" at his home studio.

Accordingly, if it is determined that the 34 Unpublished Recordings embody preexisting composition lyrics, melodies, and vocal arrangements that Elliott independently created, Elliott retains her sole ownership rights in Elliott's preexisting lyrics, melodies, and vocal arrangements, if Williams cannot otherwise affirmatively show by a preponderance of the evidence that he made any independent contributions to the 4 SISTA Songs, namely, "*Sweat You Down*," "*Secret Admirer*," "*I Wanna Know*," and "*I Wanna Be With U*", Williams cannot claim any interest of any kind in those songs. In other words, Williams must make an affirmative showing by a preponderance of the evidence that the four 4 SISTA Songs included Williams' work. In doing so, Williams cannot rely upon lyrics, melodies, and vocal arrangements Elliott created prior to Williams recording Elliott at his home studio.

In addition, if the works featuring the vocal performance of Elliott that Williams claims to have in his possession were created after the SISTA songs were created, Williams could not have made any contributions to the SISTA songs, and they are not derivative works of any songs in Williams' collection.

12

The implications of this principle are dispositive. Even assuming that the Unpublished Recordings could be construed as joint works (which Elliott vehemently contests), Elliott's lyrics, melodies, and vocal arrangements unequivocally predated and are entirely severable from Williams' alleged instrumentals. Accordingly, Elliott remains the sole author of those preexisting compositional elements and retains the right to exploit them in new arrangements, recordings, or derivative works without any obligation to or interference from Williams. See *Brownstein*, 812 Fed. Appx. at 78.

Elliott's reuse of her original compositions, whether in the 4 SISTA Songs or elsewhere, does not create any interest or entitlement in these works on the part of Williams, especially where Williams admittedly did not make any contributions to these 4 SISTA Songs. See also *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (requiring originality and independent creation); *UIRC-GSA Holdings Inc. v. William Blair & Co., LLC*, 264 F. Supp. 3d 897, 899 (N.D. Ill. 2017) (ownership rights are limited to original contributions).

C.  **Williams' Purported Damages**

Following the Court's Order granting Elliott's motion for summary judgment as to all of Williams' claims premised on Aaliyah's song *Heartbroken* [ECF 285], Williams' only remaining claims in the Williams Action relate to an alleged percentage of net profits derived from the exploitation of 4 previously shelved songs released by the musical group *SISTA*. As the record in this matter crystallizes, separate and apart from Williams' inability to rebut the uncontroverted evidence that these 4 *SISTA* songs, along with the entire *SISTA* album, were publicly released on or around September 20, 1994, **well before Elliott ever even met Williams** [ECF 269-1 at ¶¶4, 20, ECF 308][1], the total amount in controversy regarding these *SISTA* songs is approximately $27.16.

---

[1] Williams' purported "claims" regarding these 4 *SISTA* songs were not included within the initial Complaint Williams filed in this action, and were only later added within a subsequent amended iteration of his pleadings. Based upon these claims, Williams appears to be attempting to claim entitlement to a share of the exceedingly limited net profits Elliott has received in connection with the exploitation of these 4 *SISTA* Songs that were publicly released on or around September 20, 1994, even though Elliott had already written the lyrics, vocal arrangements, and corresponding melodies for the *Sista* songs "*Sweat You Down*", "*Secret Admirer*", "*I Wanna Know*", and "*I Wanna Be With U*", and the entire *SISTA* album was already publicly released, **well before Elliott had ever even met Williams**. [ECF 269-1 at ¶¶4, 20, No. 2:18-cv-05418-NIQA].

More specifically, as set forth within Elliott's verified supplemental responses to Williams' first set of interrogatories, a breakdown of Elliott's publishing administrator's collected earnings from 2012 to the present in connection with each of the subject SISTA songs is as follows, with the only non-negligible source of income for the musical works emanating from music streaming services:

| Song Title | Earnings/Income to Date |
|---|---|
| I Wanna Be Wit U | $4.18 |
| Secret Admirer | $18.59 |
| Sweat You Down | $31.55 |

As the uncontroverted record evidence makes clear, the total amount in controversy in connection with the entirety of Williams' remaining claims, comprised solely of Williams' alleged entitlement to 50% of Elliott's "earnings" in "shelved" *SISTA* songs, is **$27.16**.

Elliott seeks no monetary damages but requests attorneys' fees under 17 U.S.C. § 505 for defending a meritless claim. In the Elliott Action, Elliott seeks equitable relief (declaratory judgment and return of Handwritten Materials) and attorneys' fees under 17 U.S.C. § 505. Elliott reserves the right to supplement damages claims based on further discovery.

## V. LEGAL ISSUES PERTINENT TO ELLIOTT'S CLAIMS

As repeatedly set forth in Elliott's sworn declarations, Elliott never, at any time, shared, or intended to share, any rights of authorship with Williams in the lyrics, vocal arrangements, and corresponding melodies embodied in any of the Unpublished Recordings, **all of which Elliott independently wrote and authored**. [ECF 269-1 at ¶¶25, 26, and 44]. Because Elliott never, at an time, shared, or intended to share, any rights of authorship with Williams in the lyrics, vocal arrangements, and melodies embodied in any of the Unpublished Recordings, all of which Elliott independently wrote and authored, Elliott is entitled to a Declaratory Judgment as a matter of law that Elliott is the sole author and owner of her own lyrics, vocal arrangements, and melodies underlying the Unpublished Recordings. As part of Elliott's claim for Declaratory Relief in the Elliott Action, Elliott also respectfully requests that the Court enter a Declaratory Judgment that Elliott is the sole and exclusive author and owner of her own Handwritten Materials. This fact related to Elliott's sole and exclusive authorship and ownership of her own Handwritten Materials is not in dispute. In fact,

to the contrary, discovery in the Elliott Action revealed that Williams has proactively attempted to sell Elliott's Handwritten Materials to various third parties, including by promoting the Handwritten Materials as belonging to Elliott.

The law does not compel Elliott to unwittingly share title in Elliott's preexisting musical compositions with sound engineers who maintained home studios and an assortment of preexisting beats. In affirming the District Court's proper rejection of a putative co-authors co-authorship claim, the Second Circuit in *Childress* underscored this precise principle as follows:

> Examination of whether the putative co-authors ever shared an intent to be co-authors serves the valuable purpose of **appropriately confining the bounds of joint authorship arising by operation of copyright law**, while leaving those not in a true joint authorship relationship with an author **free to bargain for an arrangement that will be recognized as a matter of both copyright and contract law**. Joint authorship entitles the co-authors to equal undivided interests in the work, *see* 17 U.S.C. § 201(a); *Community for Creative Non–Violence v. Reid*, 846 F.2d 1485, 1498 (D.C.Cir.1988), *aff'd without consideration of this point*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). **That equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors**. The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work **can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright**, *see* 17 U.S.C. § 201(d).

*Childress*, 945 F.2d at 508-09 (emphasis supplied).

Elliott has produced clear evidence that Elliott and Williams never intended to create a joint work. Conversely, Williams has no evidence that he and Elliott intended to create any joint works, or that by referencing and singing Elliott's preexisting independently created lyrics, vocal arrangements and corresponding melodies in Williams' studio, Elliott ever intended to share authorship rights with Williams in Elliott's preexisting lyrics, vocal arrangements, and corresponding melodies. Elliott's testimony that she never intended for these Unpublished Recordings to be joint works is undisputed and it is therefore undisputed that Elliott never intended to share any rights of authorship with Williams in her lyrics, vocal arrangements, and corresponding melodies. [ECF 264-1 at ¶¶24-25, 33, 41, 44].

VI.   **ADDITIONAL CONSIDERATIONS**

Elliott intends to file motions to permit remote testimony via videoconference for out-of-state witnesses Louise C. West, Esq., Chonita Coleman, and Radiah Scott, including due to significant

travel burdens imposed upon these witnesses coupled with their limited roles in authenticating the Exclusive Recording Artist Agreement and related documents. [ECF 325, Exs. A–D]. These limited remote appearances ensure reliable testimony with appropriate safeguards, causing no prejudice to Williams.

Federal Rule of Civil Procedure 43 allows for remote, live video trial testimony under certain circumstances. Specifically, the Rule provides:

> At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

Fed. R. Civ. P. 43(a). Elliott anticipates that each of these witnesses' testimony would be approximately one hour in length.

Finally, as set for in Elliot's motion *in limine* No. 4, this case is appropriate for a bench trial because the claims and defenses in both the Williams Action and the Elliott Action are predominantly equitable in nature, involving declaratory judgments of copyright ownership and claims for an accounting, which historically are resolved by courts rather than juries. The minimal monetary stake of $27.16 [ECF 294] and the absence of legal remedies like significant damages further diminish the need for a jury, while a bench trial promotes judicial economy by avoiding complex jury instructions and potential prejudice from Williams' resoundingly baseless and speculative claims.

## VII.   SCHEDULE OF EXHIBITS

A schedule of exhibits Elliott may offer in her case-in-chief is attached hereto as Exhibit "A". Elliott reserves the right to supplement the aforementioned list in advance of trial. Elliott further reserves the right to supplement or amend this list to identify documents and things identified by Williams, to include any pleading, motion or paper filed with the Court, any written discovery responses, any documents or things produced during discovery, materials about which she was not previously aware, summaries of evidence, materials intended as demonstrative aids and/or any and all exhibits listed by Williams. Elliott also reserves the right to reproduce and/or enlarge any part of any and all exhibits identified in this Pretrial Memorandum or in Williams' Pretrial Memorandum

| | |
|---|---|
| DATED: June 6, 2025 | Respectfully submitted,<br><br>**SINGH, SINGH & TRAUBEN, LLP**<br><br>s/ Michael A. Trauben<br>Michael A. Trauben (admitted *pro hac vice*)<br>mtrauben@singhtraubenlaw.com<br>Thomas K. Richards (admitted *pro hac vice*)<br>trichards@singhtraubenlaw.com<br>400 South Beverly Drive, Suite 240<br>Beverly Hills, California 90212<br>(310) 856-9705<br><br>**LEADER BERKON COLAO & SILVERSTEIN LLP**<br><br>Joseph G. Colao (PA Bar No. 312870)<br>Patrick Fitzmaurice (PA Bar No. 316993)<br>1515 Market Street, Suite 1200<br>Philadelphia, PA 19102<br>(215) 755-0455<br><br>*Attorneys for*<br>MELISSA ARNETTE ELLIOTT |

**SCHEDULE OF ELLIOTT'S PROPOSED TRIAL EXHIBITS**

| EXHIBIT NO. | DESCRIPTION | BATES |
|---|---|---|
| E1 | Transcript of the deposition of Terry Williams, dated April 15, 2021 | |
| E2 | Transcript of the deposition of Terry Williams, dated August 2, 2023 | |
| E3 | Errata sheet to Williams' August 2, 2023 deposition, claimed to be signed by Williams on September 14, 2023 | |
| E4 | Williams' sworn supplemental responses to Elliott's first set of interrogatories served in Civil Action No. 2:21-cv-02290-NIQA, dated March 25, 2021 | |
| E5 | Williams' sworn supplemental responses to Elliott's first set of requests for production of documents served in Civil Action No. 2:21-cv-02290-NIQA, dated April 1, 2021 | |
| E6 | Documents produced by Williams in Civil Action No. 2:21-cv-02290-NIQA, consisting of various emails reflecting Williams' attempts to sell recordings featuring the vocal performance of Elliott along with Elliott's handwritten lyrics and materials to various third parties, including auction houses | |
| E7 | Email message dated April 29, 2021, wherein Williams claims to produce numerous digital files reflecting scanned copies of Elliott's handwritten lyrics and materials in Williams' possession | |
| E8 | Compilation of the digital files Williams attached to his email message dated April 29, 2021, wherein Williams claims to produce numerous digital files reflecting scanned copies of Elliott's handwritten lyrics and materials in Williams' possession | |
| E9 | Elliott's second supplemental responses to Williams' first set of requests for admission, dated September 12, 2023 | |
| E10 | Copyright registration for the music for the song entitled *Brand New* in the name of Sista; Registration Number: SR0000209889; Registration Date: July 11, 1995 | |

| | | |
|---|---|---|
| **E11** | Exclusive Recording Artist Agreement dated June 25, 1993, between Melissa Arnette Elliott, along with the three other members of the musical group "SISTA," and Swing Mob Productions, Inc. ("Swing Mob"), owned by Donald Earle DeGrate Jr. p/k/a DeVante | |
| **E12** | Acknowledgement Letter dated June 25, 1993, wherein Melissa Arnette Elliott and the other members of SISTA acknowledged receipt of certain monies advanced by Swing Mob pursuant to the Exclusive Recording Artist Agreement | |
| **E13** | Inducement Letter dated July 1993, wherein Melissa Arnette Elliott and the other members of SISTA granted Elektra Entertainment, a division of Warner Communications, Inc., all the same rights and remedies granted to Swing Mob under the Exclusive Recording Artist Agreement | |